# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

RYAN SAMSEL,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

**Case No.** [ 3:26cv530 ]

## COMPLAINT

### Introduction

1.    This is an action for damages brought against the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

2.    Plaintiff, Ryan Samsel, a protestor on January 6, 2021, who never entered the United States Capitol, was arrested and detained on January 30, 2021. However, he was not indicted until seven (7) months later, on August 25, 2021.

3.    During his pre-trial detention, both pre- and post-indictment, Mr. Samsel was housed by the Federal Government by the United States Marshalls Service ("USMS") in the DC jail, county prisons and federal prisons where he was repeatedly beaten, subject to other incidents of extraordinary physical and mental abuse and routinely denied medical care.

1

4. The USMS, and other federal agents, oversaw or directed detention of Ryan Samsel across many state facilities, which failed to provide the duty of care for the many intentional and other torts committed by the staff of the county prisons and DC jail. The FTCA imposes liability for intentional torts resulting from the acts or omissions of law enforcement officers under 28 U.S.C. § 2680(h).

5. This action asserts claims for the intentional torts of assault, battery, intentional infliction of emotional distress, malicious prosecution, abuse of process and false imprisonment. Plaintiff does not assert a freestanding FTCA claim for constitutional denial of counsel or denial of medical care.

6. The denial of attorney access and medical care constitutes evidence of negligence, negligent supervision, intentional infliction of emotional distress, false imprisonment, abuse of process, malicious prosecution, and medical malpractice under the law of the jurisdiction where each act or omission occurred.

7. Mr. Samsel went through a jury trial and was convicted on February 26, 2024, and subsequently pardoned on January 20, 2025, and never sentenced. He was, however, wrongfully detained pre-trial as a "danger to the community," based on false allegations, as set forth below.

8. Mr. Samsel was wrongfully detained for one day after receiving a full pardon, based on false allegations of an outstanding warrant made by the prosecutor.

9. Plaintiff has exhausted his administrative remedies as required by 28 U.S.C. § 2675(a), and this suit is instituted after the expiration of the six-month

statutory period for agency review.  Plaintiff seeks compensatory damages for physical and mental harm.

## PARTIES

8.    Plaintiff Ryan Samsel is a U.S. citizen and a resident of Bristol, PA.

9.    Mr. Samsel was arrested and detained on January 30, 2021, indicted seven months later, on August 25, 2021, and convicted on February 2, 2024.

10.    Plaintiff was detained while in federal custody or under federal authority, including the District of Columbia Jail ("DC Jail"), Rappahannock Regional Jail ("RRJ"), Central Virginia Regional Jail ("CVRJ"), Northern Neck Regional Jail ("NNRJ"), Federal Detention Center Philadelphia ("FDC Philadelphia"), United States Penitentiary Lewisburg ("Lewisburg"), and Metropolitan Detention Center Brooklyn ("MDC Brooklyn"), (the facilities), among others, some of which are federal institutions and some of which are county facilities that contract with the United States to house federal detainees.

11.    Defendant United States of America is named pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671–2680. Under the FTCA, the United States is the sole proper defendant for the negligent and wrongful acts or omissions of its employees acting within the scope of their employment.

12.    The tortious conduct stated herein was committed by employees of various federal agencies and components, including but not limited to the U.S. Department of Justice ("DOJ"), the U.S. Attorney's Office for the District of

Columbia ("USAO-DC"), the USMS, and the Federal Bureau of Prisons ("BOP"), as well as employees and agents at Facilities that housed Plaintiff on behalf of the United States, and all such acts and omissions are, in this action, attributed to the United States for purposes of liability under the FTCA.

13.    Throughout his detention, Samsel remained under custody of USMS.

14.    Prior to Mr. Samsel's scheduled sentencing, upon President Trump being sworn in, as one of his first acts, pardoned Mr. Samsel on January 20, 2025.

15.    Due to his prosecutor's false claim that Plaintiff had warrants outstanding, his release from custody was delayed to January 21, 2025.

16.    The negligent, intentional, unreasonable and wrongful acts and omissions alleged in this Complaint were carried out by identified federal employees and agents of the DOJ, including the USAO-DC, (Assistant United States Attorney ('AUSA")), AUSA April Nicole Russo of the USAO-DC; Trial Attorney Danielle Rosborough of the National Security Division of DOJ, and AUSA Karen Rochlin (while detailed to the USAO-DC), the USMS, (U.S. Marshalls Derek Haywood and Jamie Hamilton); the BOP, and Federal Facilities, including, the District of Columbia Jail, (Correctional Officer Corporal Hayes (a/k/a "Haze"); Northern Neck Regional Jail, (Supervisory Correctional Officer Captain English, Medical Physician James R. Dudley, M.D., who provided medical services to detainees at Northern Neck Regional Jail); and John and Jane Does 1–100, including other federal law-enforcement, correctional, medical, transport, and administrative

4

personnel whose identities are not yet known but who participated in, directed, approved, or acquiesced in the acts and omissions described herein.

17.     In this FTCA action, none of these individuals is named as a defendant in his or her personal or official capacity; they are identified as federal employees and agents whose conduct, undertaken within the scope of their federal employment or agency, is attributed to Defendant United States of America for purposes of liability under 28 U.S.C. §§ 1346(b) and 2671–2680.

## JURISDICTION AND VENUE

18.     As a direct and proximate result of multiple batteries while incarcerated, Samsel suffered severe physical and psychological injuries detailed in this Complaint.

19.     From January 30, 2021, through his conviction on February 2, 2024, he was primarily detained, pre-trial, in the Commonwealth of Virginia.

20.     The United States is liable for these torts under the FTCA because they were committed by federal law enforcement officers acting within the scope of their employment.

21.     This Court has subject matter jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), which grants federal district courts exclusive jurisdiction over civil actions on claims against the United States for money damages for injury caused by the negligent or wrongful act or omission of any Government employee while acting within the scope of their employment.

22. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims that occurred within Virginia, and this judicial district.

23. Specifically, Plaintiff was incarcerated during pre-trial detention at Rappahannock Regional Jail (RRJ), Central Virginia Regional Jail (CVRJ), and Northern Neck Regional Jail (NNRJ), all located within the Commonwealth, and this District. Further the District of Columbia jail (DC Jail), a federal facility, appears to be within a jurisdictional radius of this court.

24. Venue is also proper in this District pursuant to 28 U.S.C. § 1402(b), as many of the acts and omissions complained of occurred here.

25. The DOJ is the appropriate federal agency for presentment because the tortious acts and omissions alleged herein were committed by employees of its components, including the U.S. Attorney's Office for the District of Columbia, the U.S. Marshals Service, and employees of the Bureau of Prisons.

26. Plaintiff has complied with the jurisdictional prerequisite for an FTCA action against the United States by presenting his claim to the DOJ. On November 24, 2025, Plaintiff submitted a duly executed Standard Form 95 (SF-95) to the DOJ. The DOJ confirmed receipt by letter on March 2, 2026. 28 U.S.C. § 2675(a); (see also, *McNeil v. United States*, 508 U.S. 106, 113 (1993)).

27.    Plaintiff's filed SF-95 included a detailed Statement of Facts and a Tort Valuation Analysis that asserted a claim for money damages in the sum certain amount of $17,980,000 for physical and mental injuries.

### FACTUAL ALLEGATIONS — BACKGROUND

28.    Mr. Samsel attended the rally on January 6, 2021, with his girlfriend, and did not know any other attendees.

29.    At no point was Plaintiff alleged to have entered the Capitol building itself and he and his girlfriend left the protest without arrest.  He was only arrested later on January 30, 2021.

30.    The events giving rise to this action began with Plaintiff Ryan Samsel's arrest on or about January 30, 2021, in connection with his presence at the United States Capitol grounds on January 6, 2021.

31.    Plaintiff was held in pretrial detention for nearly seven months before being indicted on August 25, 2021.

32.    During this time, he was entitled, as a pretrial detainee, to protection from punishment and to adequate medical care under the Due Process Clause, under standards analogous to those applied to convicted prisoners under the Eighth Amendment.  The failure of federal agents to ensure these protections contributes to their negligent or wrongful act or omission of any employee of the Government while acting within the scope of their employment.

33.    Shortly after the arrest on January 30, 2021, when first detained at the FDC Philadelphia, Mr. Samsel was pressured by law enforcement to provide false statements and misleading information. Mr. Samsel's public defender informed him those prosecutors in Washington, D.C.—including Russo, and Rosborough, and other Prosecutorial Actors were willing to offer leniency, including probation instead of an indictment, if Mr. Samsel agreed to cooperate by providing testimony against another protestor, that Mr. Samsel knew to be false.

34.    Specifically, Plaintiff was asked to testify that he witnessed Joe Biggs carrying a gun. Plaintiff had not seen Joe Biggs with a gun and refused to agree to testify to that. The DOJ pressured him to identify a man he did even know, and, upon information and belief, falsely leaked innuendo to the media that Mr. Samsel was a Proud Boy.

35.    Following Plaintiff's refusal to provide false testimony, said prosecutors caused or influenced Plaintiff to be immediately transferred to the DC Jail, from Pennsylvania, by coordinating with U.S. Marshals and custodial officials, bypassing standard transfer procedures.

**The First Major Beating in DC Jail After Placement by USMS**

36.    Upon his arrival at DC Jail, correctional staff, including Corporal Hayes (known to Plaintiff as "Haze"), publicly and falsely labeled Plaintiff a "Proud Boy" to other inmates, placing a target on him and subjecting him to harassment, spitting, thrown objects, and threats from the general population. This labeling was

objectively unreasonable and exposed Plaintiff to foreseeable violence and emotional distress.

37.   On or about March 21, 2021, Mr. Samsel, while an unindicted pretrial detainee at DC Jail, was brutally assaulted through coordinated acts by guards who swiftly zip-tied his hands behind his back, led by Corporal Hayes, and other DC Correctional Officers. Other inmates saw him taken away by the guards and stated that they knew something was going to happen. They moved Plaintiff to a cell, off camera, where he was viciously beaten by these government employees until he lost consciousness.

38.   As a direct result of this assault, Plaintiff was taken by ambulance to Howard University, where an ophthalmology report dated 3/29/2021 stated in part, "CT Max/Face showed right orbital floor and nasal bone fractures . . . possible traumatic optic neuropathy." His wrist was also severely injured, which shows his wrists were held down.

39.   Plaintiff was left with reduced vision in his right eye and ongoing seizure activity, and wrist injury and pain, reflecting deliberate indifference to his serious medical needs and a breach of the United States' duty, through its employees, to provide adequate medical care to a detainee in its custody.

40.   After a United States Magistrate Judge recognized the jail's failure to provide follow up care, the court ordered his transfer to a different facility, and

he was moved under the supervision of U.S. Marshals Service officials to RRJ in or about April 2021.

### Commonwealth of Virginia Facilities Used by the USMS

41. At RRJ, Plaintiff was deliberately endangered by being housed with county inmates and forced to sleep on a mattress on the floor, and he was subsequently assaulted by a cellmate who recognized him from television news coverage, resulting in his placement in solitary confinement.

42. During this period, RRJ correctional and medical officials denied Plaintiff adequate medical care for his serious pre-existing vascular conditions and for the new injuries sustained in the DC Jail assault.

43. A vascular surgeon at Rappahannock Vascular Surgery determined that Plaintiff required surgery to remove his first two ribs bilaterally, but RRJ officials stated they lacked the resources for the necessary aftercare and therefore refused to provide the procedure, leaving his serious medical condition untreated.

44. Mr. Samsel was also denied consistent access to telephone calls—including during the period of his father's illness and death—and was denied access to a law library, further illustrating that the conditions imposed on this pretrial detainee (who was still an unindicted detainee) were punitive and not rationally related to any legitimate, non-punitive governmental objective.

45. Mr. Samsel's attorneys filed for his release to custody at home, arguing that he was not a danger to the community and raised severe health concerns.

The government conceded in its Opposition Memorandum to Defendant's Motion to Revoke Detention Order, at page 11, that "the Government does not dispute that Samsel has medical conditions that are alarming" making clear the government recognized Samsel's health circumstance.

46. The government did not allege that he was a flight risk but instead in its Opposition filed on June 2, 2021, wrongly sought to prejudice the court by alleging that Samsel's "assault on 0-1 (Capitol Police Officer Edwards) is just the latest in a string of prior assaultive offenses, dating back all the way to 2006."

47. The AUSA referred to misdemeanors that were more than ten years old and referenced reports for incidents where there were no convictions.

48. The government also failed to mention others can be seen pushing on the bike rack that led to Capitol Police Officer Edwards falling, who were not detained pre-trial; or that it was Mr. Samsel who ran to pick Officer Edwards up.

49. After this filing, the media began to report that Mr. Samsel assaulted a female, and he falsely received a "sex offender" label when placed at CVRJ.

50. No action to rectify the erroneous labeling occurred until, Russo finally, nearly two months later, on July 21, 2021, at 8:31 a.m. wrote to USMS Haywood an email stating "Derek – Samsel somehow was classified as a sex offender apparently (according to his attorneys). He is not a sex offender." – despite her allegations on June 2, 2021.

11

51.    Plaintiff was transferred to CVRJ in or around August 1, 2021, after a hearing in which USMS Haywood represented to the court that Plaintiff would be placed at a facility equipped to meet his medical needs.

52.    However, despite the communication from Russo to Haywood that Samsel was not a sex-offender, upon arrival at CVRJ, Plaintiff's medical records had not been transferred, and CVRJ personnel falsely classified Plaintiff as a "sex offender." Based on this false classification, he was held for approximately 70–90 days in a "reception" cell measuring approximately three feet by six feet, with the lights kept on 24 hours a day and a black magnet covering the window.

### The Second Major Beating After Placement by USMS

53.    Upon Samsel's August 25, 2021 long delayed indictment, prosecutors increased the charges from those listed in the original arrest warrant, in a manner consistent with the coercive pressures brought to bear on him.

54.    During this period, Plaintiff was deprived of exercise, showers, basic hygiene, and library access, in conditions that served no legitimate security purpose, and were objectively punitive as applied to a pretrial detainee.

55.    Then, after a court proceeding in which his attorneys brought attention to his situation, on or about September 15, 2021, at CVRJ, a team of CVRJ correctional officers acting entered his unit; despite Plaintiff's documented medical orders requiring front-cuffing, he was shackled from behind while an extremely heavy-set guard sat on his back with a shield, his head was slammed into the

ground and then he was dropped on a set of steps, causing a concussion, contusions, and bruising to his back.

56.    Mr. Samsel was brutally assaulted by correctional staff during a so-called "cell extraction." According to USMS records, he was "dropped while being removed" from his cell.

57.    The medical records further provide that after receiving medical attention in solitary confinement, Mr. Samsel had "mild redness on the left side of his face at the cheek bone area." An email documents the visit of a USMS nurse the next day, where she gave Samsel an ice pack and they discussed his vomiting a few times in the middle of the night.

58.    Defense counsel had previously arranged for an unrecorded video call with Mr. Samsel for Friday, September 17, 2021; however, officials with the CVRJ inexplicably did not make Mr. Samsel available for the call. The call would have enabled defense counsel to see injuries sustained by Samsel. Thereafter, at CVRJ, Mr. Samsel remained in solitary, video-monitored twenty-four (24) hours a day.

59.    CVRJ nonetheless appeared in court at the time to claim it was "Administrative Segregation" and that Mr. Samsel was allowed out for an hour once a day, which was a false claim, as Mr. Samsel was not allowed outside at any time at CVRJ. Further, the basis a pre-trial defendant having to be in Administrative Segregation was not explained, nor was the 24-hour video ever produced.

60.     This was objectively unreasonable force used against a pretrial detainee, contrary to known medical restrictions and was clearly punitive.

61.     While still at CVRJ, he was subsequently taken to Medical Imaging done by Radiology at UVA on or about September 22, 2021, where UVA confirmed Mr. Samsel was bleeding from "the presence of gynecomastia in the sub-areolar of both breasts," which they related to "a likely result from Mr. Samsel's known thoracic outlet syndrome."

62.     Instead of any follow up treatment for his condition, Plaintiff was subjected to approximately four more months of solitary confinement with 24-hour lighting causing severe sleep deprivation and psychological harm.

**The Third Major Beating After Placement by USMS**

63.     After these events were raised in a court hearing by his attorneys, the court acknowledged the matter and ordered transfer of Samsel to NNRJ in Warsaw, Virginia.

64.     Following the court's acknowledgement and transfer, on Thursday, October 7, 2021, the New York Times published an article making the government's argument that Mr. Samsel has refused to cooperate with the government following his initial questioning upon arrest by the FBI more than eight (8) months ago, again associating Mr. Samsel with the Proud Boys claiming Mr. Samsel saw a flashing gun.  (See Alan Feuer, Dispute Over Claim that Proud Boys Leader

Urged Attack at Capitol, Alan Feuer, the New York Times (Oct. 7, 2021) (https://www.nytimes.com/2021/10/07/us/politics/proud-boys-capitol-riot.html)

65.    Following this New York Times article, on or about October 12, 2021, after a scheduled legal visit, a group of correctional officers led by Captain English, a supervisory correctional officer at NNRJ, took Mr. Samsel to an area with no cameras, and viciously assaulted him.

66.    Plaintiff was slammed into a wall, dragged to an area without camera surveillance, repeatedly stabbed in the legs and ankles with keys by Captain English and his officers, punched, and had his head slammed into a door. The assault was so severe that Plaintiff required CPR.

67.    A Nursing Progress report dated 10/13/2021 provided in part: "Dried blood was found on the right side of the inmate's face from the right ear down to the jawline, cleaned up with gauze and water. There was a noticeable knot on his lip from where he had bit it during the fall, no bleeding at this time. Two hematomas on the left side of the inmate's face around the eye are visible, the one above the eyebrow was *from a prior incident* but the one on the cheek-bone is from this current incident. Inmate was also complaining of pains in the right wrist mainly, minor injury to left wrist, but inmate is mainly concerned with the right wrist. Heavy swelling with bruising across the back of hand and wrist. There are now noticeable bumps appearing on the back of the right hand, white in color compared to the dislocation of the bruising.  These bumps were not detected in the assessment of the inmate on the incident on 10/12/2021. An ice pack

15

was given to be placed on the areas of swelling on the left side of face, and another was given to be placed on the right wrist. . . . Two scratches were noted running from the base of the neck to the top of the back, left scratch 5" in length, right scratch was 4". I called Dr. Dudley on the incident, giving him all the information stated above. He stated "Transportation can take him, EMS is not needed for this incident." . . . .

68. When Plaintiff awoke, he found six used doses of Narcan laying around him. It appears Narcan was tortiously applied to Plaintiff presumably to falsely create an appearance of drug use to justify the beating. Use of Narcan was also confirmed in a "Nursing Progress Report" dated 10/12/2021 at 22:55.

69. Plaintiff was transported to VCU Tappahannock Hospital, where he was diagnosed with another fractured orbital bone and stab wounds. When contacted by 911 dispatchers, NNRJ officials, including Captain English, initially denied knowledge of any incident, evidencing an attempted cover-up of the assault.

70. His attorney went to see him and found swollen bumps raised all over his head and his wrists were visibly flat. The jail prohibited the attorney from bringing in any electronic devices in meeting with him, so she was unable to photograph him, but they obtained a photograph with his black eye via an online meeting promptly scheduled filed with the court.

## The Restraint Chair

71.    The NNRJ officers retaliated against the Plaintiff for reporting the assault. They strapped Plaintiff into a restraint chair for approximately seventeen hours, leaving him in four-point restraints.

72.    Mr. Samsel was held strapped in the chair with no bathroom breaks or ability to stand.  There were windows into the room he was held in, where kids of approximately middle school age viewed Samsel restrained.

73.    Samsel developed a blood clot in his leg and was temporarily unable to stand upon release.  Officers teased Samsel on his inability to immediately walk. During this period, he was also denied access to showers for a month.

## Pennsylvania and More Misconduct

74.    His attorneys again sought his release, which was denied. Mr. Samsel was subsequently transferred to Pennsylvania. The USMS transferred him from NNRJ to FDC Philadelphia and then to USP Lewisburg.

75.    At FDC Philadelphia, immediately after Plaintiff made a phone call in which he expressed concerns about alleged FBI corruption, one or more prosecutors initiated or instigated a purported criminal referral concerning Plaintiff's custodial status.

76.    Mr. Samsel suffered conditions that bore no relationship to any legitimate, non-punitive objective.

77.   BOP correctional officers, working with USMS and the prosecutors, placed Plaintiff in months of punitive solitary confinement, with the lights in his cell kept on continuously.

78.   Plaintiff was forced to sleep on a mace-sprayed mattress, was denied access to his legal counsel and legal materials and had scheduled surgeries and appointments canceled or obstructed, exacerbating his serious medical conditions and constituting intentional interference with necessary medical care.

79.   Plaintiff was at times forced to "fish" for food through the toilet system, and denied basic hygiene, exercise, and religious materials.

80.   At USP Lewisburg, surgery for Plaintiff was finally scheduled and then nearly as quickly, anonymously canceled the day before it was scheduled to occur. Plaintiff was then again placed by correctional officers into solitary confinement.

81.   In this solitary housing unit ("SHU"), Plaintiff was forced to rotate approximately every ten days into a different cell where the prior inmate had defecated throughout the cell.  Plaintiff worked to clean the cell without adequate supplies or protective equipment.  This cycle continued for approximately three months, during which Plaintiff also suffered from untreated shingles that resulted in permanent scarring, numbness, and ongoing pain.

**Conviction and Post-Conviction Misconduct**

82.   Mr. Samsel went through a jury trial and was convicted on February 2, 2024, but was not sentenced before his pardon on January 20, 2025.

18

83.    His conviction included 18 USC § 1512 (c)(2), 2, under the allegation of obstruction of an official proceeding, a twenty (20) year maximum statute, and felony assault.

84.    Upon conviction, Samsel was transferred to MDC Brooklyn, where the BOP housed him on one of the facility's most violent gang units, known as the "Mac Baller" unit.

85.    Due to crowding and threats from inmates, Plaintiff was assigned for extended periods to a mop closet rather than a cell. Photos of this circumstance became public.

86.    BOP correctional staff failed to protect him from a stabbing to his arm, that he was forced to self-stitch to avoid a medical report that could lead to punishment, and in other instances condoned or ignored assaults and robberies. MDC Brooklyn suffered constant lockdowns, and Samsel witnessing a stabbing that led to the death of an inmate.

87.    MDC Brooklyn repeatedly placed Plaintiff in solitary confinement in retaliation for his writing articles for the Gateway Pundit newspaper detailing his abuse, and, on at least some occasions, deliberately housed him with a leader of the MS-13 gang who attacked him for his political beliefs.

88.    This pattern of abuse, retaliation, and negligent failure to provide care spanned Plaintiff's detention at DC Jail, RRJ, CVRJ, NNRJ, FDC Philadelphia,

USP Lewisburg, and MDC Brooklyn continued from shortly after his detention on January 30, 2021 throughout January 21, 2025.

89.    President Trump pardoned Ryan Samsel on January 20, 2025; however, then, AUSA Rochlin made an unfounded request that Plaintiff remain imprisoned based on a false claim that he had an outstanding warrant.

90.    Thereafter, Plaintiff was unlawfully detained for one full day beyond the effective date of his pardon, until January 21, 2025.  Samsel was released upon confirmation by correctional officers that no warrant existed.

## COUNT I
## Malicious Prosecution

91.    Plaintiff incorporates by reference all preceding allegations, as if fully set forth herein.

92.    Malicious prosecution is an intentional tort expressly cognizable under the FTCA's law enforcement provision, 28 U.S.C. § 2680(h).

93.    Malice and the lack of probable cause are shown through the basic elements of the original complaint, and arrest warrant.

94.    A malicious prosecution claim is sustained where a proceeding is induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith.  The prosecutors' pressure on Samsel to testify that Biggs had a gun, and his refusal to falsely testify was followed by the harsher indictment and the Government's sole pursuit of Samsel for the enhancements on bodily injury and weapon in this incident.

95.    Prosecution sought to induce testimony that Samsel witnessed Joe Biggs brandish a gun. Samsel refused to falsely testify and thereafter suffered extraordinary abuse and a malicious prosecution.

96.    Plaintiff, upon observing Officer C. Edwards fall, immediately ran to and helped the officer up, yet among six individuals pushing on the bike rack, only Samsel was deemed to use the rack as a weapon and to have caused serious bodily injury to Edwards.

97.    This targeting of Samsel was consistent with the systematic targeting and abuse that Samsel faced pre-indictment in DC, RRJ, CVRJ, and pre-trial detainee at NNRJ, based in substantial part on the matter involving Joe Biggs and the pressure prosecutors brought on Samsel to bear.

98.    On April 18, 2022, Officer Edwards testified to the House Select Committee that "I sustained a concussion.  It has been described to me as traumatic brain injury.  The injury has had side effects of what's called vasovagal syncope."

99.    However, the MRI of her brain that was taken on January 14th, 8 days after the January 6th incident that would have caused her "traumatic brain injury", shows that "[t]his is an unremarkable MRI examination of the brain" meaning a normal MRI with no significant abnormalities.

100.    Contemporaneous CCTV and the FBI filed Complaint acknowledged that "Samsel picked [Officer Edwards] 0-1 up off the ground."

101.    Reports, affidavits, and pre-trial statements were materially incomplete.  YouTube video demonstrates that, while Samsel pushed the fence forward with

21

multiple others, upon seeing Officer Edwards on the ground, he ran to help her up and lifted her off the ground, as recognized by the media in this clip. (https://www.youtube.com/watch?v=y2PYWDc8fYo&t=9s).

102.    Prosecutors fabricated convictions from Samsel's history, relied on misdemeanors greater than ten years old, spread false allegations that Mr. Samsel was a "sex offender," falsely claimed Samsel was a "Proud Boy" appearing to have once again leaked this to the New York Times, and even falsely stated that he had an outstanding warrant that delayed his freedom after the full pardon.

103.    These acts exceed the prosecutor's role as advocate and eliminated absolute immunity.

104.    The government's concealment of material facts and affirmative misrepresentation of Plaintiff's record constitutes malice.

105.    The government's false statements to keep Samsel detained both pretrial and post pardon and leaking allegations to the media, shows they lacked genuine probable cause but retaliated with a severe indictment when he did not agree to state that another J6 protestor had "flashed a gun."  Further, to the extent a grand Jury indictment was returned against Plaintiff, any presumption of probable cause arising from that indictment, is an abuse of process, under color of law.

106.    Prosecutors are not entitled to absolute immunity. Their multiple false characterizations and statements along with those of Officer Edwards, demonstrate that the government acted with malice, as recognized by the FTCA and the law of the District of Columbia.

22

107.   Further, the charges were further unfounded in the wrongful application of 18 USC §1512 (c)(2), a 20-year maximum statute resulting in a law created out of Sarbanes Oxley, found inapplicable by the Supreme Court of the United States, added to enhance Mr. Samsel's potential sentence despite that he never entered the Capitol.

108.   Plaintiff also suffered "special injury and severe prejudice from false information persisting online from the prosecution of Samsel.

109.   Samsel received favorable termination in the form of a full pardon on January 20, 2021, prior to sentencing but after having served nearly four years.

110.   By reason of the foregoing, under 28 U.S.C. §§ 1346(b) and 2680(h), the United States is liable for malicious prosecution. Plaintiff has suffered the liberty deprivations, physical and psychological injuries, and reputational harm that persists as of this filing.

## COUNT II
### The Right to Counsel and Abuse of Process

111.   Plaintiff incorporates by reference all preceding allegations, as if fully set forth herein.

112.   Under the FTCA, Defendant United States is liable to Plaintiff for the negligent, intentional and malicious acts and omissions of its employees and agents.

113.   While acting within the scope of their employment, the Government unreasonably interfered with Plaintiff's Sixth Amendment right to have the

23

Assistance of Counsel for his defense, and his due-process right to a fair trial by systematically impeding his ability to communicate with counsel, review discovery and legal materials, attend hearings, and prepare his defense.

114.    The same conduct also that took his right to counsel, and lack of due process, with the constitutional norms, define the relevant duties and standard of care.

115.    For pretrial detainees, unreasonable interference with the ability to consult counsel and prepare a defense is itself an impairment of the right to counsel and need not be justified by security or administrative concerns where less restrictive alternatives exist.

116.    Plaintiff invokes these constitutional principles solely to define the non-discretionary duties owed to him and the standard of care applicable to the United States under the FTCA.

117.    From January 30, 2021, through at least his conviction on February 2, 2024, Plaintiff was a federal pretrial detainee. During his pretrial detention Plaintiff remained in primary U.S. Marshals Service custody.

118.    As a pre-trial detainee, Mr. Samsel was housed in multiple Facilities, including DC Jail, RRJ, CVRJ, NNRJ, FDC Philadelphia, USP Lewisburg. During this pretrial period, Government employees repeatedly imposed restrictions that severely curtailed Mr. Samsel's ability to communicate with counsel, review discovery, and participate in hearings.

119.    The major beatings by guards in different facilities, including the DC Jail, CVRJ and NNRJ, and denial of reasonable medical care following those beatings, the substantial battering of Samsel's brain, eye sockets and wrists, the substantial amount of time in solitary with 24-hour lighting, and extraordinarily tortious circumstances such as the 17-hour restraint chair and the SHU rotation where he was forced to follow a convict that left feces through the cell; all interfered with legal defense preparation.

120.    Resulting diagnoses of concussions, contusions, orbital bone breaks, neuropathy, vomiting from concussions, bleeding from chest due to untreated thoracic outlet syndrome, blood clot in the leg from the restraint chair, damaged vision and other injuries including to his hands, all followed from the beatings and mistreatment and reduced his ability to prepare for legal matters in the long run, and affected his brain function far beyond the basic idea of available time and access.

121.    Infections stemming from wounds, denial of hygiene, and dangerous exposure to feces also caused illnesses and injury that derailed his efforts to advance his defense.

122.    Above and beyond the physical and mental injuries, the outright refusal to accommodate his legal and medical needs when not in the SHU further ensured that he would not be able to contribute meaningfully to his own defense.

123.    The fabricated sex-offender classifications and criminal-history narratives that resulted in confinement in closet spaces also diminished his access and ability to prepare for legal matters.

124.    As a direct and proximate result of this negligent and intentional interference with his access to counsel and trial preparation, Plaintiff, as a pre-trial detainee, suffered additional and distinct injuries, including: (a) severe emotional distress, anxiety, depression, and cognitive impairment associated with being unable to communicate regularly and confidentially with counsel, to review discovery, or to attend hearings; (b) the loss and diminishment of meaningful opportunities to challenge fabricated evidence and false classifications, to develop factual and legal defenses, and to seek more favorable bail, plea, or trial outcomes; and (c) the denial of a fair trial and fair adjudicative process in his criminal case.

125.    The coercive pressures brought to bear on Ryan Samsel all evidence an abuse of process intended as a "whip" to coerce Samsel into falsely testifying against Joe Biggs and after his refusal, as a punishment for refusing to.

126.    Plaintiff proceeds solely against the United States under the FTCA, using the Sixth Amendment, Due Process Clause, and implementing regulations as supporting evidence of the duties and standard of care that federal employees and agents failed to perform, where those failures caused negligence, negligent supervision/training/retention, intentional infliction of emotional distress, and medical negligence.

## COUNT III
## Negligence and Medical Malpractice

127.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

128.    Plaintiff suffered objectively unreasonable beatings by guards at three facilities, including the DC Jail, CVRJ and NNRJ that have been detailed in preceding paragraphs.  As a result of each he sustained new injuries and exacerbated his prior vascular condition that went untreated.

129.    The Bureau of Prisons owes a duty of care to prisoners irrespective of its decision to contract with independent contractors to provide certain services.

130.    Federal regulations codify these duties for pretrial inmates. Bureau of Prisons rules require that wardens "provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis," provide access to legal materials, and allow pretrial inmates, upon request, to telephone their attorneys "as often as resources of the institution allow." 28 C.F.R. § 551.117(a)–(c).

131.    This duty included, without limitation, providing humane and safe conditions of confinement; protecting Plaintiff from foreseeable harm at the hands of staff and other inmates; ensuring that known medical restrictions (such as his requirement for front-cuffing due to thoracic outlet syndrome and chronic blood clots) were honored; and providing timely and adequate medical care for

both his serious pre-existing conditions and the acute injuries he sustained while in custody.

132.    The FTCA renders the United States liable for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment, under circumstances where a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b), 2674.

133.    The prosecution was fully aware, which they admitted, of the "alarming" health circumstance of Mr. Samsel, and yet completely failed in their duty of care to supervise their contractors at DC Jail, NNRJ, CVRJ and elsewhere, who beat and tortured Mr. Samsel, and then denied him reasonable medical care.

134.    The Government not only failed to meet their duty of care but intended to physically and mentally injure Ryan Samsel as an inducement to testify against Joe Biggs.

135.    As a direct and proximate result of this lack of medical treatment and medical prevention, Plaintiff suffered severe and permanent injuries, significant pain and suffering, exacerbation of his pre-existing vascular disease, and substantial emotional distress and psychological trauma, and damages allegations incorporated herein.

136.    Mr. Samsel suffered because of the above acts and omissions amount to assault, battery, negligence, negligent supervision/training/retention,

intentional infliction of emotional distress, and medical negligence under both Virginia and D.C. state law.

## COUNT IV
## Assault and Battery

137. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

138. While the FTCA generally bars claims arising out of intentional torts such as assault, battery, and false imprisonment, it contains a specific waiver of sovereign immunity for such claims when they arise from the acts or omissions of federal "investigative or law enforcement officers." 28 U.S.C. § 2680(h).

139. The federal correctional officers, Bureau of Prisons staff, and U.S. Marshals are "investigative or law enforcement officers" within the meaning of 28 U.S.C. § 2680(h), as they are officers of the United States who are empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.

140. At all relevant times, these federal employees were acting within the scope of their employment, and their intentional torts are therefore imputable to the United States under the FTCA.

141. Force that amounts to punishment violates the Due Process Clause if it is not rationally related to a legitimate, nonpunitive objective or is excessive in relation to that non-punitive objective.

29

142. Federal law enforcement officers and their agents subjected Plaintiff to repeated acts of assault and battery. These acts constituted the intentional, unlawful, and harmful or offensive touching of Plaintiff without his consent and without legal justification.

143. Custodial officers managed by the USMS raised in Mr. Samsel's mind an apprehension of imminent bodily harm.

144. As a direct and proximate result of - at least - four separate assaults, Mr. Samsel suffered damages in the form of fear and apprehension of imminent bodily harm, physical and emotional pain and suffering, untreated or undertreated physical and mental injury, medical bills, humiliation, and loss of life.

145. Mr. Samsel did not consent to the unreasonable excessive force repeatedly used on him.

146. As a direct and proximate result of these batteries, Mr. Samsel suffered physical and emotional damage, including conscious pain and suffering.

147. At all times relevant hereto, the custodial agents, including Captain English, and Dr. James Dudley, and the custodial officers at DC Jail, including Corporal Hayes, and at CVRJ, acted with in an objectively unreasonable manner.

148. The force used in the foregoing incidents—including, without limitation, the March 21, 2021 beating at the DC Jail led by Corporal Hayes, the September 15, 2021 cell extraction at CVRJ, the October 2021 assault at NNRJ

30

carried out by Captain English and his officers and the November 2021 use of the restraint chair for 17 hours —was extreme, punitive, and not rationally related to any legitimate, non-punitive governmental objective, particularly as applied to a pretrial detainee.

149.    As a direct and proximate result of these tortious batteries—each of which involved harmful or offensive contact without consent and bore no rational relationship to any legitimate, non-punitive penological objective—Plaintiff suffered extreme pain and severe, permanent physical and psychological injuries.

## COUNT V
## Pattern or Practice Claim and/or Civil Conspiracy

150.    Plaintiff hereby adopts and incorporates by reference the allegations contained in all paragraphs of this Complaint as though set forth fully herein.

151.    Defendants' conduct, including the deprivation of constitutional rights, represents not a single isolated, accidental or peculiar event, but occurs regularly under the direction and/or control of USMS officers and prosecutors.

152.    This is further evidenced by the wrongful prosecution of 20-year maximum statute, 18 USC § 1512 (c)(2), 2, found inapplicable by the Supreme Court of the United States.

153.    Overt acts done in furtherance of the common scheme are many in this matter as described in previous paragraphs that related predominantly to the effort to induce Samsel to testify against Joe Biggs.

154.    The scheme was also punitive as can be seen be the extent of beatings, their severity, the multiple tortious applications of solitary confinement, and the restraint chair.

155.    The Government's failure to properly prosecute, supervise, reprimand, and discipline its officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of Plaintiff's injuries.

## COUNT VI
## Intentional Infliction of Emotional Distress

156.    Plaintiff hereby adopts and incorporates by reference the allegations contained in all the paragraphs of this Complaint as though set forth fully herein.

157.    Defendant, through its AUSAs, USMS, and Corrections Officers' actions constituted behavior so outrageous in character and so extreme in degree, that it shows to be malicious, willful, and intentional.

158.    As a direct and proximate result of the acts and conduct of Defendant, Plaintiff did suffer and continues to suffer severe emotional and mental distress, including but not limited to: inability to focus, anguish, humiliation, embarrassment, fright, shock, pain, discomfort, sleeplessness, and anxiety and the

false public statements have not been corrected, creating physical danger and fresh mental injury on a daily basis.

## COUNT VII
### False Imprisonment

159.    Plaintiff hereby incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

160.    Federal law enforcement officers and other federal employees unlawfully subjected Plaintiff to false imprisonment. False imprisonment is the intentional confinement of a person against their will and without legal justification under the applicable law of the jurisdiction where the confinement occurs.

161.    On January 20, 2025, Plaintiff received a full Presidential Pardon. Despite this, a prosecutor falsely claimed that Plaintiff had a warrant outstanding that would prevent his release. After the warrant was found to be meritless, he was released on January 21, 2021.  On belief and information, this misconduct was later recognized by DOJ and resulted in her dismissal.

162.    As a direct and proximate result of this intentional act, Plaintiff was unlawfully confined for one full day, until January 21, 2025, after all lawful authority to detain him had terminated.  This post-pardon confinement constitutes false imprisonment under the law enforcement proviso of the FTCA, for which the United States is liable.

## COUNT VII
## Negligent Supervision, Training, and Retention

163.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

164.     This cause of action is brought against Defendant United States of America for its direct negligence in the supervision, training, and retention of its employees.  In this FTCA action, these individuals are not named as defendants in their personal or official capacities; rather, their conduct, undertaken within the scope of their federal employment or agency, forms the basis for the United States' liability for negligent supervision, training, and retention under the law of the place where the negligent acts or omissions occurred. 28 U.S.C. § 1346(b).

165.     The United States, acting through its agencies, owed Plaintiff a duty to adequately train, supervise, and discipline its law enforcement, correctional, and medical personnel to ensure they performed their duties in a lawful manner that did not violate the rights and safety of persons in their custody. This duty included implementing policies and procedures sufficient to prevent foreseeable harm and to ensure compliance with clearly established constitutional requirements governing the treatment of pretrial detainees and inmates, including the prohibition on punitive conditions of confinement and objectively unreasonable uses of force against pretrial detainees and the obligation to provide adequate medical care and to avoid deliberate indifference to serious medical needs.

166. These failures constituted a systemic breakdown in management and oversight by the relevant federal agencies, exemplified by the failure to properly train, supervise, and discipline identified employees and agents.

167. As a direct and proximate result, Plaintiff suffered the continuous and severe physical and psychological injuries detailed in this Complaint.

168. As a direct and proximate result of the negligent and wrongful acts and omissions of the Government employees, Plaintiff Ryan Samsel suffered severe, permanent, and life-altering injuries and damages.

## PRAYER FOR RELIEF

For these reasons, Plaintiff asks this Court to enter a judgment in his favor and provide the following relief, compensatory damages to include, but are not limited to, the following categories of loss:

a. Past and future physical pain and suffering resulting from multiple brutal assaults and other uses of force by correctional staff and law-enforcement officers acting under federal authority, including but not limited to: a fractured orbital floors; bilateral nasal bone fractures; a dislocated jaw; multiple concussions and traumatic brain injuries with loss of consciousness; an acute kidney injury; stab wounds to his legs, ankles, and arm; severe wrist injuries from punitive restraints, and the severe aggravation of his pre-existing thoracic outlet syndrome and chronic blood-clotting condition due to the denial and obstruction of medically necessary vascular surgery and other treatment.

b. Past and future mental and emotional anguish, including severe Post-Traumatic Stress Disorder (PTSD) manifested by intrusive flashbacks, chronic hypervigilance, and nightmares; debilitating anxiety, depression, and recurrent panic attacks; cognitive and memory impairments and difficulty concentrating attributable to repeated head trauma and prolonged psychological torture; and profound humiliation, fear, and emotional distress resulting from the assaults, retaliatory solitary confinement with continuous lighting, sleep deprivation, public degradation in the restraint chair, and exposure to extreme violence and unsanitary conditions at the Facilities.

**c.** Permanent physical impairment and disability, including but not limited to partial vision loss in his right eye; ongoing seizure activity and other neurological deficits; chronic pain and functional limitations related to his aggravated thoracic outlet syndrome and vascular disease; permanent numbness and neuropathic pain in his back and other areas from untreated shingles and nerve damage; scarring and residual numbness from stab wounds and wrist restraints; and other lasting impairments to his physical health and functioning caused or exacerbated by the assaults, medical neglect, and conditions of confinement.

**d.** Loss of enjoyment of life, including the loss and substantial diminishment of Plaintiff's ability to engage in many of the normal activities of daily living, recreational pursuits, relationships, and life experiences he previously enjoyed prior to his injuries, as well as the ongoing limitations and pain that will continue to impair his quality of life.

**e.** Past medical expenses incurred for emergency care, hospitalizations, diagnostic testing, medications, and other treatment necessitated by the assaults, medical neglect, and conditions of confinement, and future medical expenses that will be required for necessary surgeries (including deferred vascular surgery), neurological care, ophthalmologic care, physical therapy, pain management, and long-term psychological and psychiatric treatment for the remainder of his life.

**f.** Lost wages and loss of earning capacity, including income lost from his prolonged detention, physical and psychological impairments, and the diminishment of his future earning capacity due to lasting disabilities and the continuing need for medical and psychological care.

**g.** Other out-of-pocket expenses and consequential damages reasonably flowing from the injuries described herein, including costs associated with travel for medical care, assistance with activities of daily living, and other expenses that Plaintiff has incurred and will continue to incur as a result of the tortious conduct of federal employees acting within the scope of their employment.

**h.** The nature, extent, and preliminary valuation of these injuries and damages, as associated with each of the distinct tortious acts alleged, are further set forth an exhibit to the FTCA Presentment, which identifies each incident, and assigns a preliminary compensatory valuation to each tort, and the previously submitted Tort Table in the Presentment, is incorporated by reference.

**i.** Consistent with the jurisdictional requirements of the FTCA, Plaintiff presented a claim for monetary damages in a sum certain to the Department of Justice. Plaintiff's administrative claim demands compensatory damages in the amount of **$17,980,000.00**. Plaintiff's recovery in this action is accordingly limited to that amount, except as may be permitted by 28U.S.C. § 2675(b) for newly discovered evidence or intervening facts.

36

**j.** Plaintiff does not seek punitive damages against the United States, as such damages are expressly barred by the FTCA. 28 U.S.C. § 2674.

WHEREFORE, Plaintiff Ryan Samsel respectfully requests that this Honorable Court enter judgment in his favor and against Defendant United States of America, and grant the following relief:

a. An award of compensatory damages in an amount not less than **$17,980,000.00**, consistent with the sum certain demanded in Plaintiff's administrative claim and as limited by 28 U.S.C. § 2675(b), to compensate for Plaintiff's severe and permanent physical injuries, physical pain, mental anguish, emotional distress, medical expenses, loss of enjoyment of life, and other damages;

b. An award of post-judgment interest at the maximum rate permitted;

c. A trial on all issues so triable in this action; and

d. The following are incorporated herein by reference:

e. **Confirmation of DOJ Acting as Lead Agency:** A letter dated March 2, 2026 from the Civil Division, Torts Branch confirming receipt of this Tort Claim on November 19, 2025.

f. **Declaration of Counsel.** A declaration from counsel attesting to the administrative presentment of Plaintiff's claims as required by 28 U.S.C. § 2675(a), attached hereto.

### Preservation Demand and Spoliation Reservation

g. Plaintiff hereby demands that Defendant United States of America take immediate steps to preserve all evidence relevant to the allegations in this Complaint. This includes, but is not limited to, all paper and electronically stored information ("ESI"), such as emails, text messages, internal memoranda, investigative reports, personnel files, training manuals, video and audio recordings, medical records, institutional logs, grievance records, and any other communications or documents related to Ryan Samsel's detention, medical care, transfers, and the incidents described herein. This preservation obligation is consistent with federal regulations requiring that every effort be made to preserve files, documents, and other tangible evidence that may bear on litigation. *See, e.g.,* 32 C.F.R. § 750.32(d)(4).

h. Plaintiff has a good-faith basis to believe there is a substantial risk of spoliation of evidence. Throughout his detention, Plaintiff's medical records were repeatedly lost, withheld, or failed to transfer between facilities. This pattern of lost evidence indicates a high probability that evidence may be destroyed, altered, or concealed if not preserved.

i. Defendant is hereby on notice of its obligation to prevent the destruction of relevant evidence. Plaintiff reserves the right to file a motion for a

37

formal preservation order and to seek sanctions, including adverse inference instructions at trial, for any spoliation of evidence.

### Certification of Exhaustion and Alternative Pleading

j.  Plaintiff has exhausted his administrative remedies as required by the Federal Tort Claims Act, 28 U.S.C. § 2675(a), by presenting his claim to the appropriate federal agency on November 24, 2025 and instituting this action after expiration of the six-month statutory waiting period.

k.  Plaintiff expressly reserves the right to challenge any future certification by the Attorney General under the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("Westfall Act"), 28 U.S.C. § 2679(d)(1), that a federal employee was acting within the scope of their employment, should such a certification arise in any related proceeding.

l.  Regarding the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, Plaintiff is no longer a "prisoner" as defined in 42 U.S.C. § 1997e(h), and thus the PLRA's exhaustion requirement does not bar this action. In the alternative, to the extent § 1997e(a) is deemed applicable, any failure to fully exhaust administrative remedies was a direct result of the actions of federal employees, which rendered those remedies effectively unavailable as reflected in Count 2 herein.

Respectfully submitted,

/s/ Peter G. Haller

Peter G. Haller
6401 Potomac Ave.
Alexandria, VA 22307

*Counsel for Plaintiff Ryan Samsel*
June 9, 2026

Virginia Bar No. 88385, Admitted in EDVA, DDC, DC, NY.
(551) 358-2943
PeterHaller@hillstrat.com

1

I hereby certify that on this 9th day of June, 2026, I will cause a copy of the foregoing Complaint and all attached exhibits to be served upon the United States Attorney for the Eastern District of Virginia and upon the Attorney General of the United States in Washington, D.C., by certified mail, return receipt requested, as required by Federal Rule of Civil Procedure 4(i).

Respectfully submitted,

/s/ Peter G. Haller

Peter G. Haller
6401 Potomac Ave.
Alexandria, VA 22307

*Counsel for Plaintiff Ryan Samsel*
June 9, 2026

Virginia Bar No. 88385, Admitted in EDVA, DDC, DC, NY.
(551) 358-2943
PeterHaller@hillstrat.com

2